IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 19, 2016


**IN RE DAYTON R., ET AL.**


**Appeal from the Juvenile Court for Henderson County**
**No. 07917, 60201C      Larry J. Logan, Judge**

_____


**No. W2015-01848-COA-R3-JV – Filed April 7, 2016**
_____


Appellants petitioned for grandparent visitation pursuant to Tennessee Code Annotated Section 36-6-306. After a trial, Appellants were awarded visitation consisting of one weekday per month, the entire day of December 26, and four hours on each of the two children's birthdays. Appellants appeal from the trial court's order, arguing that the trial court abused its discretion by not awarding them more visitation. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the Court, in which ARNOLD B. GOLDIN, and BRANDON O. GIBSON, JJ., joined.

Lloyd R. Tatum, Henderson, Tennessee, for the appellants, Samuel M. and Francis M.

# OPINION

### BACKGROUND

This is the second appeal of a case involving the visitation rights of two great-grandparents. This Court previously recounted the facts of this case in *In re Dayton R.*, No. W2014-01904-COA-R3-JV, 2015 WL 1828039, at *1 (Tenn. Ct. App. Apr. 21, 2015) ("*Dayton I*"):

> The children at issue in this case Dayton R. and Samuel

R., were born in 2003 and 2006, respectively. The children were adjudicated dependent and neglected in 2007. The maternal and biological great-grandparents of the children, Samuel M. and Francis M. (hereinafter "Mr. and Mrs. M." or "[Appellants]"), were awarded temporary custody. The children resided with Mr. and Mrs. M. for the next six years. The biological parents [("Appellees" or "Mother" and "Father")[1]] petitioned for custody of the children and were awarded custody in March 2014. The court found no clear and convincing evidence that restoring custody to the biological parents would pose a substantial risk of harm to the children, then ages 11 and 7.

Mr. and Mrs. M. filed a petition for grandparent visitation on March 31, 2014, seeking to establish visitation with the children. The biological parents filed separate responses to the petition, opposing any award of visitation. Among other things, the children's mother asserted that great-grandparents do not have standing to seek grandparent visitation pursuant to Tennessee's grandparent visitation statute, Tenn. Code Ann. § 36-6-306, and therefore, she argued, the trial court lacked subject matter jurisdiction to adjudicate the great-grandparents' claim.

*Id.* The trial court conducted a hearing on the great-grandparents' petition on June 6, 2014. Before the hearing, the trial court asked the parties whether they wanted to proceed with the substance of the petition or postpone the hearing to give the trial court time to determine the issue of standing. The parties decided to proceed with the hearing on the petition, at which time the trial court stated that after the trial it would analyze the issue of standing and then the merits of Appellants' petition if standing was found.

At the hearing, both great-grandparents and both biological parents testified.[2] Mr. M, the children's great-grandfather, testified that the children began residing with him and his wife, Mrs. M., when Dayton was three years old and Samuel was two months old. He stated that he and his wife had grown very close to the children since they were in the home for over six years. Mother first brought the children to Appellants when Samuel "was deathly

---

[1] The children's biological parents are divorced. As separate parties, the parents participated in the proceedings before the trial court, but neither participated on appeal by filing an appellate brief.

[2] Counsel for Mother noted that a motion to dismiss the petition had been filed based on a lack of subject matter jurisdiction. Still, the parties decided to proceed with the hearing so that the trial court could "take [the motion to dismiss] under advisement and go ahead and hear the evidence and just decide that as a part of [its] final decision."

sick with pneumonia." Appellants took him to the hospital where he was diagnosed with pneumonia and respiratory syncytial virus (commonly referred to as RSV). Mr. M. stated that Samuel was repeatedly taken to the hospital or doctor's office over the next several years based on illnesses stemming from his asthma. Mr. M. testified that Samuel's health declined when visitation with the biological parents resumed and alluded to the causes of this decline being cigarette smoking and exposure to pets.

Mr. M. stated that when Mother eventually resumed custody of the children and became their primary residential parent, the parties' relationship grew contentious, and Appellants were typically denied contact with the children. Mr. M. stated that on several occasions Appellants attended the children's baseball games. According to Mr. M., the biological parents told the children not to speak to Appellants when they saw them at the games. At one game, Mr. M testified that, "[Father] proceeded to talk really ugly to me and said he didn't want the kids to be around me. I didn't want to have a problem. I didn't think it would be good for the kids. . . . I just left and never went back." Mr. M. testified that he believes the children love him and his wife, and he loves the children. He stated that he was requesting that the trial court award visitation:

> [A]t least every other weekend, have a weekend in our home. I'd like for them to be able to have vacation time with us in the summer, a couple of weeks. . . . And I'd like to see them on birthdays and holidays. I'd also - - we would like to go to the school and have lunch with the children. That wouldn't subtract from anyone else's time, doing things like that. And go to the sports events and be able to see them play their particular sports.

Mrs. M, the children's great-grandmother also testified. Like Mr. M, she reiterated that the children developed a close bond with Appellants during the six years they resided with them. She stated that she is certain the children miss Appellants. She described a phone call she received from Dayton: "[Dayton] went home with a friend over the weekend. He called and he talked to me for two hours. He cried. He said, "Grandma, I want to see you so bad, but I'm scared to ask Mama and Daddy." She admitted that she offered Father $100.00 for each hour he would permit her to see the children.

Father testified that he objected to visitation because of the problems Appellants have allegedly created for the biological parents. To this end, he explained that he has "no problem letting them see the [Appellants]," but that Appellants have called the Department of Children's Services and the local sheriff's department several times unnecessarily for "welfare check[s]." He testified that he was "here to tell the [c]ourt and [Appellants] to respect the fact that we are the parents. . . . Respect us as parents and let us be the parents, and they will see them." He also stated that if the court ordered visitation with Appellants

- 3 -

every other weekend, the children would miss some of their regularly scheduled activities.

Regarding the well-being of the children, Father stated that both Dayton and Samuel are "moving forward." He testified that their focus has improved since custody was given to Mother and Father. He further stated that both he and Mother are working with the children and their teachers to improve upon any remaining issues. According to Father, at the time of trial, the children spent Monday through Friday with Mother and then spent the weekend with Father. He stated that, after Appellants had the children for six months to a year, Appellants were asked to relinquish custody[3] and "fought the system." Father stated that the reason for Appellants having custody so long was "not anything we did wrong by failing drug tests or anything like that." According to Father, there were several procedural issues that lengthened the process, such as alternating judges and different issues surrounding allegedly contemptuous acts by Appellants.[4]

Mother testified[5] that she obtained custody of the children from Appellants on March 27, 2014. Since the time she resumed custody and was named primary residential parent, she testified that they have improved in school. Similarly, according to Mother, neither of the children have had any health problems while in her care. With respect to the children's diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD"), discussed further *infra*, she testified that she has not experienced any issues. She stated, "I mean, they're children, I mean, and they're boys" and that, in relation to other children, they behaved similarly. She stated that, while Dayton's teachers at school indicate that he is well-behaved, she has had to discipline Samuel because he has a "problem keeping his hands to himself." With respect to visitation with Appellants, Mother generally testified that she has not prevented any contact between Appellants and the children. Still, she testified that if Appellants were granted visitation, it would "cut into" her and Father's time with the children.

Mother stated that she did not believe that the children were "disabled." She also disputed that Appellants had been prevented from seeing the children. She testified that they visit with Appellants after baseball games and "go to eat" with them. Mother also testified that Appellants were allowed to come to her house and visit the children "any time they want to. I have never said that they couldn't." However, Mother did say that she preferred Appellants call before they arrived to visit the children at her home.

---

[3] It is unclear what entity or party sought to have Appellants relinquish custody.

[4] These contemptuous acts are not described in the record on appeal.

[5] Mother was present but did not testify at the second trial. Mother's testimony is taken solely from the first trial.

Additionally, the testimony of Dr. Michael Polson,[6] a licensed marriage and family therapist, was admitted as an exhibit during this trial. Dr. Polson began his therapy with the children in August 2010 when the Appellants elicited his help after the children displayed some "maladaptive behavior." The children were in Appellants' care during the time Dr. Polson treated them. Upon his first meeting with the children, he observed that they displayed symptoms of ADHD, which they had both been previously diagnosed with by another psychologist.

Dr. Polson testified that, because of the children's ADHD diagnoses, he had to work with Appellants and the children to develop a plan to help the children feel more secure in their home environment and help Appellants in effectively controlling and disciplining the children. Regarding children with ADHD, Dr. Polson testified:

> It's considered a neurological impairment in the brain, and it relates to dealing with mechanisms around executive management, executive control. In other words, these children have neurological impairments - - the ability to control themselves. So their capacity to self-regulate, to make better choices about their behavior, to slow down, delay, and think about what's going on, there are impairments to that. They don't - - the best way I can describe it to a lay audience is they don't learn from their mistakes.

He opined that children with ADHD are also more difficult to rear. According to Dr. Polson, studies show that there are several factors that help ADHD children succeed: (1) a higher than average IQ; (2) a loving relationship with stable, nurturing caretakers; (3) a stable and predictable routine; and (4) caretakers who are able to continue this routine for "one to two decades." At the time Dr. Polson testified, he expressed his concern that the children did not "know where their home is" because they were primarily living with Appellants and only visiting Mother and Father.

He also observed that Samuel, the youngest child, was "clingy to his great grandfather and would not go very far from him." According to Dr. Polson, "[b]oth boys, but particularly Samuel, expressed a great fear that he would be removed from his Great Grandpa and his Great Grandma." Dr. Polson testified that the children demonstrated anxiety and uncertainty that they would be removed from the home by "Social Services." Through therapy, he stated

---

[6] Dr. Polson originally testified during a hearing on a motion to stay visitation that occurred in a different proceeding. It appears that Appellants filed this motion to prevent the children from visiting with their parents.

- 5 -

that the children's behavior and attitudes began to improve while the children were living with Appellants. In May 2011, the trial court ordered that the children have visitation with Mother and Father. According to Dr. Polson, the children began to have more "behavioral disturbances" and eventually regressed to their initial state when they began therapy. Additionally, Dr. Polson noted that from around August to December 2011 Samuel's physical health began to decline, and he was diagnosed with asthma. Dr. Polson testified that Samuel looked sickly and began having more chronic respiratory infections. Over the course of the next few months, Dr. Polson recalled that Samuel was taken to the emergency room or the clinic several times for asthmatic episodes. Dr. Polson testified that Samuel was hospitalized for several days in February or March 2012 for the same issues. He also stated that Dr. Gregg Mitchell, Samuel's family medicine physician and supervisor of the residency program at the hospital where Dr. Polson practices,[7] wrote a letter that was placed in Samuel's medical records. The letter states:

> Our medical records on Samuel document a dramatic increase in the increased frequency and severity of his asthma since last summer since he started having weekend visits with his parents. It is not possible to "fake" or misrepresent these symptoms when they occur. . . . I am worried about his current environmental exposure or that his current environmental exposure is dramatically worsening his asthma . . . . We urge [t]he [c]ourt to make the best judgment possible to bring his home environments under stricter control from the adults who are in a position to eliminate the cigarette smoking and pet exposure.

Dr. Polson had never spoken with Mother or Father concerning the children's treatment. Dr. Polson testified that Mother and Father had not attempted to contact him and that he typically did not attempt to contact parties who did not express any interest in participating in counseling. His ultimate opinion was that continued visitation with the biological parents was "cruel" because it did not provide the children with any stability. Furthermore, according to Dr. Polson, the children would be at a substantial risk for harm if visitation continued with the parents or if the parents ever obtained custody.

Subsequent to the hearing,
> [o]n September 9, 2014, the court entered an order finding that "as great-grandparents, [Mr. and Mrs. M.] do not fall within the definition of grandparents under Tennessee law." As such, the trial court concluded that the great-grandparents lacked standing to petition the court for visitation rights, and the court did not

---

[7] Dr. Polson described Dr. Mitchell as "a colleague, but I report to him. He is my boss."

> have subject matter jurisdiction to award visitation to Mr. and Mrs. M. Upon dismissal of their petition, Mr. and Mrs. M. timely filed a notice of appeal to this Court.

*Id.* In *Dayton I*, however, this Court reversed the trial court's ruling and held that the great-grandparents had standing pursuant to the grandparent visitation statute. *Id.* at *3–4. We then remanded the case back to the trial court to rule upon the merits of the great-grandparents petition for visitation. *Id.*

On July 20, 2015, the trial court conducted another hearing. The evidence presented at this hearing largely tracked the evidence presented at the first trial.[8] On August 21, 2015, the trial court entered its Findings of Facts and Conclusions of Law. The trial court ultimately awarded Appellants visitation for eight hours on the second Sunday of each month, plus December 26 of each year and four hours on each child's birthday. The trial court prohibited Appellants from interfering with the "routine pre-scheduled activities" of the children. Additionally, Mother and Father were prohibited from intentionally scheduling activities that interfere with Appellants' visitation. On September 8, 2015, the trial court entered its Order Granting Grandparent Visitation, which incorporated its findings and conclusions by reference. From this judgment, Appellants timely appealed.

## ISSUES

Appellants raise one issue, which we have taken from their brief and restated: whether the trial court abused its discretion by allegedly failing to award Appellants a "reasonable" amount of visitation with the children pursuant to Tennessee Code Annotated Section 36-6-306(c).

## STANDARD OF REVIEW

Recent Tennessee caselaw provides that the standard of review for an appellate court reviewing a trial court's visitation order, including one for grandparent visitation, is governed by the abuse of discretion standard, with the best interest of the children's welfare given "paramount consideration." *See Huls v. Alford*, No. M2008-00408-COA-R3-CV, 2008 WL 4682219 (Tenn. Ct. App. Oct. 22, 2008) (citing *Smallwood v. Mann*, 205 S.W.3d 358, 361

---

[8] In addition to testimony from the parties, the trial court conducted an in camera examination of both minor children, ages twelve and eight at the time of the second trial. Before the in camera examination, the trial court explained that, unless any of the parties objected, it would speak to the children in chambers with a court reporter present, but without any of the parties' attorneys. After his examination of the children, the trial court concluded that both children were of sufficient maturity to state a preference concerning visitation. The trial court did not appear to rely upon either child's preference in fashioning a ruling. Accordingly, we do not discuss the children's testimony.

- 7 -

(Tenn. 2006)); ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001). A trial court abuses its discretion when it has applied an incorrect legal standard or has reached a decision which is against logic or reasoning that caused an injustice to the party complaining. ***Johnson v. Richardson***, 337 S.W.3d 816, 819 (Tenn. Ct. App. 2010) (citing ***Eldridge***, 42 S.W.3d at 85). We will not overturn the trial court's decision merely because reasonable minds could reach a different conclusion. ***Eldridge***, 42 S.W.3d at 85. Thus, the appellate court should "review a [trial] court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions." ***Tomlin v. Baxter***, No. M201401746COAR3CV, 2015 WL 7749064, at *3 (Tenn. Ct. App. Nov. 30, 2015) (citing ***Lee Medical, Inc. v. Beecher***, 312 S.W.3d 515, 524–25 (Tenn. 2010) (citations omitted)).

## DISCUSSION

The issue in this case concerns grandparent visitation, which is governed by Tennessee Code Annotated Section 36-6-306, commonly referred to as the Grandparent Visitation Statute. The sole issue for this Court's review is whether the time allotted for grandparent visitation constitutes an abuse of the trial court's discretion. This case presents an undeveloped issue in Tennessee law. The typical grandparent visitation case revolves around concerns regarding whether the petitioning grandparent has shown a complete denial of visitation necessary to trigger the statute or an allegedly erroneous award of visitation. Here, however, because neither party disputes that Appellants are entitled to some amount of visitation under the Grandparent Visitation Statute, our review is limited to whether the trial court's award was sufficient.

As this Court has previously explained, an understanding of the importance of a parent's fundamental right to raise a child as the parent sees fit is foundational to any discussion of grandparent visitation:

> Some background on grandparent visitation is helpful. The decisions of the U.S. Supreme Court and the Tennessee Supreme Court, interpreting the federal and state constitutions, explicitly prohibit any judicial assumption that grandparent/grandchild relationships always benefit the child, as contrary to the parents' fundamental right to raise their children as they see fit. *See* ***Troxel v. Granville***, 530 U.S. 57, 66–72, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (recognizing parents' fundamental constitutional right to make decisions on care, custody and control of children, finding trial court erred in

- 8 -

presuming grandparent visits are in best interest of children); ***Hawk v. Hawk***, 855 S.W.2d 573, 577–82 (Tenn. 1993) (recognizing parents' fundamental constitutional right, finding trial court engaged in "sentimental" commentary on grandparents and erred in "unquestioning judicial assumption" that grandparent-grandchild relationship always benefits child, basing award of grandparent visitation on that presumed benefit). To avoid such an assumption, the Tennessee constitution and Tennessee's grandparent visitation statute require a grandparent seeking visitation to prove, as a threshold requirement, that the child will be in danger of substantial harm if visitation is not ordered by the court. ***Hawk***, 855 S.W.2d at 581; Tenn. Code Ann. § 36-6-306(b)(1). Both the federal constitution and Tennessee's grandparent visitation statute require the petitioning grandparent to show that visitation was opposed or denied in order for the court to consider ordering visitation. ***Troxel***, 530 U.S. at 71, 120 S.Ct. 2054 (trial court erred in giving no weight to fact that parent had assented to some grandparent visitation under certain conditions); ***Huls v. Alford***, No. M2008-00408-COA-R3-CV, 2008 WL 4682219, at *7–8 (Tenn.Ct.App. Oct. 22, 2008) (in light of parents' fundamental right, Tennessee grandparent visitation statute "is not implicated" unless visitation is denied or opposed). Under ***Troxel***, pursuant to the federal constitution, in all phases of a proceeding on grandparent visitation, there is a presumption that a fit parent is acting in the child's best interest, and the court must accord special weight to the parent's determinations. ***Troxel***, 530 U.S. at 68, 70, 120 S.Ct. 2054 (plurality opinion) ("there is a presumption that fit parents act in the best interests of their children.") (If a fit parent's decision on grandparent visitation "becomes subjected to judicial review, the court must accord at least some special weight to the parent's own determination.").

***Manning v. Manning***, 474 S.W.3d 252, 256–57 (Tenn. Ct. App. 2015) (quoting ***Green v. Evans***, No. M2011–00276–COA–R3–CV, 2012 WL 1107887, at *8 (Tenn. Ct. App. Mar. 30, 2012)). Accordingly, "[g]randparent visitation statutes must be narrowly construed in order to comport with the state and federal constitutions, because they are in derogation of the parents' fundamental constitutional rights." ***Spears v. Weatherall***, 385 S.W.3d 547, 550 (Tenn. Ct. App. 2012).

Based upon the language of the grandparent visitation statute, an award of grandparent visitation must be based upon three required elements: (1) the presence of one of the situations enumerated in TCA 36-6-306(a);[9] (2) opposition to grandparent visitation by the custodial parent or parents; and (3) the "presence of a danger of substantial harm to the child." We note that neither party raises any issue with regard to these three elements on appeal. Once the trial court finds the above three elements have been met, the trial court is charged with ordering "reasonable visitation." Tenn. Code Ann. § 36-6-306(c). Here, only the question of how much visitation is appropriate under the circumstances is under our review. Consequently, we turn to the trial court's order addressing the amount of visitation awarded and its reasoning.

In its order, as stated above, the trial court awarded Appellants visitation consisting of eight hours every second Sunday of the month, the entire day of December 26, and four hours on each child's birthday. In its findings, the trial court specifically noted Mother and Father's objections to visitation, but found that, pursuant to Dr. Polson's testimony, the "children are particularly attached to [Appellants and] an attempt to sever that attachment would be extraordinarily disruptive to the children. . . . For over seven years, [Appellants] were the only parents the children knew." The trial court ultimately concluded that it could not accommodate Appellants' request for visitation every other weekend "without interfering with the relationship between the parents and the children and the ever-increasing activities of the children." To this end, the trial court stated that, because of the children's ages and the

---

[9] The enumerated situations in Section 36-6-306(a) include:

> (1) The father or mother of an unmarried minor child is deceased;
> (2) The child's father or mother are divorced, legally separated, or were never married to each other;
> (3) The child's father or mother has been missing for not less than six (6) months;
> (4) The court of another state has ordered grandparent visitation;
> (5) The child resided in the home of the grandparent for a period of twelve (12) months or more and was subsequently removed from the home by the parent or parents (this grandparent-grandchild relationship establishes a rebuttable presumption that denial of visitation may result in irreparable harm to the child); or
> (6) The child and the grandparent maintained a significant existing relationship for a period of twelve (12) months or more immediately preceding severance of the relationship, this relationship was severed by the parent or parents for reasons other than abuse or presence of a danger of substantial harm to the child, and severance of this relationship is likely to occasion substantial emotional harm to the child.

Tenn. Code Ann. § 36-6-306(a).

fact that Mother and Father do not live together, it was limited in the amount of time to award for grandparent visitation without interfering with the children's activities. The trial court also recognized that Father's parents were active in the children's lives.

Appellants[10] argue that the amount of visitation awarded by the trial court is inadequate for several reasons. Appellants assert that the trial court "ignored" the testimony of Dr. Polson, the relationship between the children and Appellants, the potential for harm to the children, and the evidence regarding the children's schedules.[11] Instead, Appellants suggest that the trial court abused its discretion when it allegedly failed to recognize several opportunities where it could have awarded more visitation:

> [G]iven that the parents both work, they and the children would benefit from [A]ppellants' help looking after the children. . . . The [trial court] might have crafted visits during the school year that might have used this to the advantage of the parties and avoided babysitting expenses for the parents. Visits during the parents' work schedule could not interfere with the children's activities or the parent-child relationship. Visits at school lunch could not interfere with the children's activities or the parent-child relationship.

Appellants note that Mrs. M. is not employed and has time to care for the children. Ultimately, according to Appellants, the trial court's order was not in the best interest of the children and "merely paid lip service to [the trial court's] obligation to 'carefully craft'" an award of grandparent visitation. *See Lovlace v. Copley*, 418 S.W.3d 1, 31 (opining that the "visitation schedule must be carefully crafted **both** to afford grandparents the visitation necessary to avoid substantial harm to the child **and** to minimize, to the extent possible, interference with the parent-child relationship") (emphasis in original).

---

[10] As a practical matter, we note that a case upon which Appellants heavily rely, *Carr v. McMillan*, No. M2007-00859-COA-R3-CV, 2008 WL 2078058 (Tenn. Ct. App. May 14, 2008), *perm. app. denied* (Tenn. Dec. 8, 2008), is designated as "NOT FOR CITATION." Rule 4 of the Rules of the Tennessee Supreme Court provide that: "If an application for permission to appeal is hereafter denied by this Court with a "Not for Citation" designation, the opinion of the intermediate appellate court has no precedential value." The rule also states that the "opinion so designated shall not be published in any official reporter nor cited by any judge in any trial or appellate court decision, or by any litigant in any brief, or other material presented to any court" except in certain circumstances not present in the instant case. Pursuant to Rule 4, we neither cite to nor rely upon *Carr*.

[11] Appellants also fail to cite to the record for the majority of the facts contained in the argument section. *See* Tenn. R. App. P. 27(a)(7) (requiring that litigants provide appropriate references to the record in the argument section of their appellate briefs). Regardless, we proceed to consider the substantive issue in the appeal. However, we caution litigants that we may not be so forgiving in the future.

As stated above, the dearth of legal guidance on this precise issue and the circumstantial nature of grandparent visitation cases require this Court to examine the trial court's order using a fact-intensive analysis. *See* Tenn. Code Ann. § 36-6-306 (omitting any provision discussing factors, other than reasonableness, to guide the trial court in determining the amount of visitation to order); *see also In re Visitation of L-A.D.W.*, 38 N.E.3d 993, 999 (opining that the nature of grandparent visitation cases coupled with the abuse of discretion standard of review necessitates a fact-intensive analysis); *Walker v. Blair*, 382 S.W.3d 862, 871 (Ky. 2012) (noting that grandparent visitation cases are "fact-intensive inquiries"). Here, the trial court's order demonstrates the delicate balance of the facts surrounding the children's best interest in maintaining a relationship with Appellants through "occasional, temporary visitation" and the avoidance of a substantial "infringe[ment] on [Mother and Father's[12]] fundamental right to 'control the upbringing . . . of their children.'" *See Hoeing v. Williams,* 880 N.E.2d 1217, 1221 (Ind. Ct. App.2008) (quoting *Swartz v. Swartz,* 720 N.E.2d 1219, 1221(Ind. Ct. App. 1999)). Although Appellants purport to request seemingly small opportunities to visit with the children that they deem not invasive to the parents' rights and the children's best interest, this Court is limited by the abuse of discretion standard of review in this case. Furthermore, this Court has previously recognized that the abuse of discretion standard supports that notion that "the appellate court will not interfere with the trial court's decision simply because it did not choose the alternative the appellate court would have chosen." *Gooding v. Gooding*, 477 S.W.3d 774, 779 (Tenn. Ct. App. Apr. 29, 2015) (citing *BIF, A Div. of Gen. Signal Controls, Inc. v. Serv. Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *2 (Tenn. Ct. App. July 13, 1988) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985))). The role of this Court is not to construct its own visitation schedule as an alternative to the trial court's visitation schedule but rather to review the trial court's version to ensure it is within the "permissible range of the trial court's options." *See BIF*, 1988 WL 72409, at *3. The trial court abuses its discretion when it "acts contrary to uncontradicted substantial evidence and ignores all valid criteria." *Gooding*, 477 S.W.3d at 779 (citing *BIF*, 1988 WL 72409, at *2 (citing *State v. Windhorst*, 635 S.W.2d 706, 708 (Tenn. Crim. App. 1982))). In this case, we cannot conclude that the trial court committed such error.

Here, we conclude that the trial court's award of visitation was not an abuse of discretion because it sufficiently recognized the importance of both the parents' fundamental

---

[12] The trial court's findings of fact and conclusions of law treat Mother and Father as a singular party as it relates to their objections to visitation with Appellants. Although the Grandparent Visitation Statute suggests that the appropriate consideration is only the "custodial parent['s]" opposition to visitation that is dispositive, see Tenn. Code Ann. § 36-6-306(a), Appellants do not raise this as an issue on appeal. Accordingly, we refer to Mother and Father as a single unit, both having superior parental rights to Appellants in this case.

interests to their children and the children's busy schedules. *See* Tenn. Code Ann. § 36-6-306(c). While we commend Appellants for their taking care of their great grandchildren for several years, we cannot conclude that the trial court erred in not ordering more visitation than it did. Although Appellants suggest that the parents and children would benefit from their help by saving on child care or transportation, the fact remains that both Mother and Father object to such an involved visitation schedule. In his testimony, Father stated that Appellants' request for bi-monthly visitation would conflict with the children's activities. Mother also expressed a concern that visitation would conflict with her and Father's parenting time, already limited by their joint-parenting arrangement. This Court, too, recognizes that the children's schedules currently revolve around attending school; playing baseball; becoming interested in starting new sports, such as football and basketball; visiting other family members, such as grandparents and cousins; and spending time between the homes of both Mother and Father.[13] This Court has previously stated that it "is generally viewed as going against the best interests of the children to have them shuffled back and forth . . . . " *Lewis v. Lewis*, No. 89-287-II, 1990 WL 14022, at *5 (Tenn. Ct. App. Feb. 16, 1990).

Additionally, albeit in a different context, Dr. Polson testified that one of his concerns for the development of the children was that "they don't know where their home is. . . . They're being exposed to several different environments. Not only that but several different patterns of parenting and socialization." Additionally, one of Dr. Polson's reasons for suggesting a limitation on the children's exposure to multiple environments was his concern that "they don't even hardly have a chance to settle down before they're in a different parenting environment." *See also* **Dodd v. Dodd**, 737 S.W.2d 286, 289 (Tenn. Ct. App. 1987) (In the context of split custody during a divorce, finding that for children to adjust successfully there "needs to be one residence, one haven in all the storms of life . . . ."). Although Dr. Polson was expressing his concern during the hearing on Appellants' motion to suspend Mother and Father's visitation, we find the testimony relevant to the issue at bar. Taking this opinion in the context in which the children now live would suggest that multiple overnight visits with Appellees may have a negative effect on the children's ability to move forward and fully integrate into Mother's and Father's homes. Furthermore, the children, as shown by the testimony, lead active lives. To require them to incessantly remain in flux, against their parents' wishes, is simply not in their best interest. The children's active lives, along with their need for stability, stand in contradiction to Appellants' request for more visitation with the children.

---

[13] The parents' residential parenting schedule indicates that, other than holidays and birthdays, Mother typically cares for the children except when they are in Father's care on the "first weekend and last two weekends of each month from Friday at 6:00 p.m. to Sunday at 6:00 p.m." In total, Mother was awarded 241 days of parenting time, while Father was awarded 124 days of parenting time.

The trial court's order demonstrates that it carefully balanced the risk of substantial harm to the children and their best interests in making an award of visitation to Appellants. Based on the foregoing, we conclude that the trial court did not abuse its discretion in awarding Appellants visitation consisting of eight hours on the second Sunday of each month, the entire day of December 26, and four hours on each child's birthday.

## CONCLUSION

The judgment of the Juvenile Court of Henderson County is affirmed, and this cause is remanded to the trial court for all further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are taxed to Appellants, Samuel and Francis M., and their surety.

_____
J. STEVEN STAFFORD, JUDGE